3-23-0-1-2-1 in re marriage of Alma Cina Appalee Cross Appellant and Eilir Cina Appellant Cross Appalee. Good morning gentlemen. Mr. Black, if you're ready you may proceed. Morning, Mayor. Thank you. May it please the court, counsel. Trial court decided this matter on the basis of promissory estoppel. There are myriad things wrong with that determination, not the least of which is promissory estoppel is not a remedy here. It's not covered under the Illinois Marriage and Dissolution of Marriage Act. It's not available in a dissolution action. Beyond that, Mr. Black, can I ask a question about that? Promissory is quite apart from the merits of it as to the argument you just made. I mean, promissory estoppel is just a theory by which the court here determined whether something should be included as marital property. How is that inconsistent with the marital act? I mean, there's all kinds of, sometimes it's a contract the court has to determine, use to determine whether something's property. Contracts aren't in the marital act either. I mean, why isn't it just a theory that was utilized by the court? How is that inconsistent with the marital act? Because the Illinois Supreme Court has been very clear that the dissolution is governed by the statute. It's a creation of its own. It's a statutory creation. It does not necessarily follow the rules of civil procedure or the rules. And we cited the case Strukoff versus Strukoff, I hope I pronounced that correctly, 76, oh, 2nd, 53, 1979, that dissolution of marriage is an entirely statutory origin in nature. And in that case, courts of equity have no inherent power in cases of divorce. The jurisdiction to determine everything is controlled by the act. All right, continue. So continuing, even if that were not the case, we believe that promissory estoppel was not properly pleaded. And even if it was and even if all those things fall by the wayside, the proofs fail under the elements for promissory estoppel. And in fact, the trial court's findings there are inconsistent. So turning then to the act itself, section 503 of the Marriage and Dissolution of Marriage Act gives us the remedies and the analysis. So that section talks about what is to be classified as marital versus non-marital. That section talks about just proportions, dividing marital property in just portions. It talks about commingling. It talks about if there's a clear and, or contribution by clear efforts, and that person will be, there would be reimbursement to the marital estate. And none of those things happened here. There was no reimbursement to the marital estate. It was just slicing off basically one quarter of the present value of the home. Now, I will note that there had been an earlier motion to dismiss count five. Oh, I'm sorry, I'm straying just a little bit. Yeah, there had been an earlier motion to dismiss count five, but that was denied. Obviously, that's part of the case right now. If the court had no, had no jurisdiction, then we're talking about a void order. But the pleading itself, if you go to the pleading itself, equitable estoppel, promissory estoppel are both pled in the same count, count five, and they're conflated. And the equitable estoppel, promissory estoppel are two things. Equal estoppel is a defense. Promissory estoppel is a claim. Equitable estoppel, there is no statute of frauds. Promissory estoppel, there is a statute of frauds unless fraud is proven. So, which leads me to my next point, which is the statute of frauds. Under the statute of frauds, again, promissory estoppel is subject to the statute of frauds. And we're talking about allegations going back many, many years. We're talking about several allegations that were made before they were even married. And we're talking about ongoing allegations over 25 years. And the statute of frauds operates to bar that. Next, the proofs not match. If you'll give me one moment here, because I lost my place. Well, the proofs do not match. The elements of promissory estoppel are unambiguous promise that plaintiff relied upon, reliance was expected by the defendant, and the plaintiff reasonably relied on the promises to that party's detriment. First and if there was some sort of promise, what was it? There is lots of different things being talked about in the record throughout, but what is the promise that we're talking about here? And relied upon to the party's detriment. Obviously, there is a issue here, but there wasn't anything proven that said the reliance to the detriment was one quarter the value of the non-marital home. Because the court found that the home was non-marital property. It was acquired before the marriage, and therefore, it wasn't to be distributed as part of the marital estate. Yet, the court found that it's going to take one quarter of the present value of that home, and it's going to give one quarter, yeah, one quarter of that to Alma, and if she is not paid that amount, then the house needs to be sold, and she gets one quarter of the profits. Well, the house is titled to the parents also, and the trial court found that the house was the property and ownership of Elyra's two parents and Elyra, so basically three owners. Were the parents named? I can't remember if the parents were named as parties to this litigation. Well, that's an interesting thing. The parents were apparently brought in as third party defendants. I don't see a pleading. I mean, they filed their appearance. They filed a motion to dismiss, but I don't see a pleading here that names them from Alma. I see a supplemental complaint, but I don't see their names on there, and it's been very confusing to me to look at that, look through that, because I'm not sure what the trial court's jurisdiction would have been over them. Granted, if they are there as third parties, but then how does the trial court have jurisdiction to order the sale of their home when they're not part of the marriage, and they are part owners of this home? It just doesn't make any sense. Except if you treat the home issue separate from the dissolution of marriage issue, because the home was acquired well before the marriage, and the home was acquired according to her testimony as compensation for her coming to the United States and living with them, and she was working. So couldn't there be a theory of promissory estoppel independent of the dissolution of marriage because everything happened before the marriage? I don't believe so, Your Honor, because the trial court made specific findings that all of those representations from way back when were not part of its analysis. They were too vague, and they were too ambiguous. It did not rely upon those that set those aside, so that wasn't part of the trial court's determination at all. Mr. Black, what about trial court's comments on the motion to reconsider? The trial court tried to explain in more clear terms what it meant, that it applied in one case to what you had just said, but ultimately there was enough there to support the promissory estoppel argument. Well, and again, I know that the court made those comments because the issue was raised that the court said that the agreement was vague, so how can a vague agreement be part and parcel of promissory estoppel, and the court wanted to clarify that the vagueness was all the stuff from way back when Alma was a minor to begin with. But it still didn't make findings about consistent with promissory estoppel. Its main judgment just says, I adopt the reasoning in the closing argument, and the closing argument cites this case. Well, that case goes to equitable estoppel, and again, we're conflating concepts again. That case went to equitable estoppel only, so basically the court said there is no equitable estoppel, but there is promissory estoppel, but to do that, I have to go to the case that says equitable estoppel. Thank you. You know, and I did raise for a moment that the authority to order a home sale that involves ownership by other parties. Granted, I guess, you know, whether they are part of this as third-party defendants, I mean, assuming that they are, I'm not sure the authority there, particularly if we're talking three-year-old marriage and dissolution of marriage act. Well, Mr. Black, let me ask you this. Simplify the facts just for my question. Let's assume a situation where the husband and wife do own a third of a house, and two other people own two-thirds of the house, and we come to a circumstance where the only asset in the marital estate, for purposes of my question, is the house. I mean, is there a mechanism for a divorce court to compel the sale of a house, or are you saying there's no mechanism? You know, I'm not aware of any, Your Honor, quite candidly. I did some research. I couldn't find anything, so I don't see anything that says there is or isn't. However, we're dealing with somebody else's property here, and it's just kind of a thing that somebody else's property shouldn't be impacted by a judgment or an award to the third party, basically. 513 does provide for a lien to be placed on the home, certainly on his interest in the home. Correct, on his interest in the home, and the other thing, too, is we're talking about the court-determined ownership, basically, in one-third, one-third, one-third. So, bottom line is, even if the trial court was correct in everything, how do we get, I mean, we should be at one-half of one-third, and not ordering the sale of the home from there. But, you know, the Section 503 also talks about reimbursement by contributions. They didn't assert contributions and reimbursement here. That would have been part of a, you know, part of the proofs, but they did not proceed under that, and the court made no findings or determinations of reimbursement by clear and convincing evidence, and, in fact, the court all along said there's no, there's really no proofs of anything. There's bank statements that aren't available. There's just nothing to substantiate all of that. Everything, there's a lot of stuff that just isn't there. We also raised the awards of the property, the $40,000, half of that, and the jewelry. The jewelry from the black safe in the closet, or excuse me, the black safe in the closet, the $40,000 that was in the lockbox in the shower, that's what Alma says when she left the house, when she next, and Elyra says they were both in the closet. Obviously, that's just, you know, the court resolving that issue the way it did, but the, strike that. I am just going to stop right here because I'm looking like I'm almost out of time, and I'll see if I have any more questions, and if I could, I would reserve the cross-appeal portion for my rebuttal. Okay. Justice Hedl or Justice Albrecht, any additional questions? Just one question. That's an abuse of discretion standard, the last comment you made about the money. It is indeed, it is indeed, Your Honor, and I just, that reminds me of one other thing, however, that the brief of Alma, and asks as its relief that if the order is reversed, then it wants the relief. So I, apparently, it's only if there's reversal of the first issue. I don't know any further. Yeah. All right. Thank you, Mr. Black. You'll have an opportunity after Mr. Hanauer. Mr. Hanauer, you're muted. Your scheduler just told me I was going to do that, and I did it, so I apologize. Justices and Mr. Black, thank you for your time. Let me do, again, Attorney James Hanauer on behalf of Alma Sena. Let me do something real quick, and that's to sort of address some of the issues that were addressed by Mr. Black and his client. First, the argument was that the trial court didn't consider reimbursement, or Alma didn't raise that issue. The trial court went into length in its decision about reimbursement, and said that they made, in fact, made a very factual finding as to what the reimbursement would be, and the trial court said that that wouldn't be equitable to do that, because it'd be too much. So the trial court considered that. It was argued during the trial. The court considered that and did not use that as an avenue. Next thing is that there was issues raised or argued about the pleadings. The Allere's brief specifically says, under the nature of the case, there are no issues raised on the pleadings. So the pleadings are not an issue on this appeal. The next issue was, were the parents, were Lefter and Petrina, the parents of Allere, made parties to the case? And the answer is yes. Judge McJoint had allowed the amendment of the pleadings. They were brought into the case, and they were brought in for the equitable claims regarding the house. With that said, there are two primary issues on appeal, and that is the allocation of the Carroll Stream residents, and the second issue is the $40,000 and the jewelry. These are factual issues, and the trial court expressly stated that it considered the credibility of the evidence, the weight of the evidence, the demeanor of the witnesses, all of the factors. The court also said that it found portions of Petrina's and Allere's testimony incredible. As a matter of fact, at one point regarding the $40,000 and the jewelry, the trial court said, someone is about to lie to me about what happened with this money. Mr. Hanna, if we can direct you, or if I can direct you to the promise-raised-staple issue, can you first tell us what was the specific promise, and who made it? The specific promise was that Alma and Allere would own 50% of the Carroll Stream residents, and Petrina and Lefter would- Can you tell me when it was specifically delineated to Alma that she and Allere would own 50%, that specific figure of the residents? Several times. The first time was in Greece before the wedding, when Petrina and Allere were in in the summer of 1995. They came over and had asked to marry Alma. Alma had just turned 15, was in eighth grade. Initially, Petrina and Alma had said, no, that's just inappropriate. Then it was promised that she would have an ownership interest in a house in the United States if she moved. Mr. Hanna, I don't want to throw you off in this answer to Justice Brennan, but specifically, didn't the court find that they didn't believe that the promise was made at the time that you're describing? No, I think what the trial court had said was that there wasn't evidence of a pre-marital agreement. The court didn't say that these facts weren't true. What the court said and clarified in the motion to reconsider is there is no substantial evidence to prove that there was a pre-marital agreement. There was no pre-marital agreement, but the promise that you're describing to us now was pre-marital. Is that what you're saying? 100%. It's one of the promises. That's where it started. Then throughout the next year, when Allere had come back to the United States, he had talked to Alma and repeatedly told her when they talked on the phone, yes, you're going to have an ownership interest in a house. So my question, Mr. Hanauer, was I'm focusing on the number 50%. I'm hearing you're going to have a house. I'm not hearing 50%. All of these conversations were that Alma and Allere would own 50%, Petrina and Lefter would own 50%. All of these conversations were the same. It was never that they would own all the house or anything like that. It was always the same, that they would have half of the house in Petrina and Allere, excuse me, Petrina and Lefter would have half of the house. When Alma then came after the house was purchased and they went to Greece, again, the promises were made in the summer of 96. Based upon those, then they came to the United States. That's where Alma and Petrina were sitting at the kitchen table. This is Alma's testimony, and Petrina said, if you're going to have an ownership in this house, you have to start working and paying for the house because there's a mortgage. Alma said that she didn't understand what a mortgage was. She had never heard that before. She thought owning the house means that you own the house completely. You don't have to have a debt on it. So that's the first time she understood the term mortgage and what she had to do. Then throughout the course of the marriage, it was, okay, if you have a 50 percent ownership in this house, then you're going to have to help us with finishing the basement, with putting a new roof on, with building the addition, with redoing the bathroom. I don't recall the 50 percent from her testimony. Can you tell me where that is? Not without looking at the complete record, Judge, but it is there. I know she testified to it without looking at the complete record, and it's real likely. But the short answer is I can't tell you where it is right now. The 50 percent that I know she testified about having an interest in it, but I don't recall the 50 percent. I know it's there. I know it's there. Let me see. Because she specifically said during the testimony that it would that she specifically said that it was not her that owns 25 percent. It was Aaliyah and Alma own 50 percent. They don't each own 25 percent. It's they own 50 percent, and Petrina and Lefter own 50 percent. Okay, so the two of them own 50 percent. Correct. It wasn't that they each own 25 percent. She was very, very clear about that, that Alma and Aaliyah had 50 percent, and Petrina and Lefter had 50 percent. Okay, that's consistent with my recollection. Yeah, very, very clear about that. Okay, so then the issue with so this comes down to credibility and findings of fact. And going back now, the Illinois Supreme Court in Newton Tractor said that promissory estoppel is a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or third person, and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The trial court specifically said that promissory estoppel was supported by the evidence by clear and convincing evidence. And if you go through the testimony and take into account the court's findings regarding credibility of Aaliyah and Petrina, the testimony was that throughout this 26-year marriage of living in the house, there were continual promises that, yes, pay the mortgage, you guys own half, we own half, including the furniture and everything else, all of these repairs. At one point, there was a time where Aaliyah and Alma got into an argument with Petrina and left and went to a hotel. The evidence is Petrina came to the hotel and says, no, because Alma had said, we want out, give us our interest in the Carroll Stream house, we're going to go buy our own house. And Petrina came to the hotel and said, do not do that. This is your house too. You own this house, come back to the house. And they did. So was Petrina an agent of Iller's? Petrina is the mom for Aaliyah. But I know, I mean, but it's not Iller that's making these promises, it's his mother. Correct. And in that particular instance, it was Petrina and not Aaliyah. And so was the kitchen table that you just talked about. Correct. Absolutely. Yes. But there were other promises made by Aaliyah as well throughout the marriage. But you're saying that we can consider his mother's promises in this divorce proceeding? Yes, because they were named as third-party defendants for the equitable issues before the trial. Is there, this gets to the second part of my question that Justice Heddles raised, who made the promise? And I'll concede for purposes of our discussion that Iller said, presumably said things during the course of the marriage to suggest that Aaliyah had an ownership interest in the house. But let's go back to Greece for a second. At the kitchen table, I mean, who's making the promises to Aaliyah? Is it Iller or is it her mother or his mother? In Greece, it was both. In Greece, it was Petrina and Iller. The testimony was that Iller and Aaliyah were allowed, I think, in essence, a date night. And Iller on the date in the house. And then Petrina made promises that she will have an ownership in the house. When they came back the second time in 96, the summer of 96, the same promises were made. Yes, if you do the marriage, you come to the United States, you will have an ownership interest in the house. And you're saying that the record supports that it was more specific than just an ownership interest. It was a, you and I are going to have a 50 percent ownership interest? Yes. Correct. The record, and I don't have it here, but Alma testified it was Alma and Iller have a 50 percent interest. Petrina and Lefter have a 50 percent interest. And again, it wasn't 25, 25, 25. And not that that was her understanding, but that was the promise in Greece. The answer is yes. The answer is yes. And the testimony from Alma was consistent that throughout the marriage, they all contributed roughly 50-50. In other words, the Alma-Iller side of the family contribute about 50 percent and Petrina-Lefter contribute about 50 percent. So the issue then becomes, is it inequitable then after all of these years and Alma making all of the, Alma and Iller making all of these contributions towards the house based upon these representations, that all of a sudden she doesn't get anything from the house and the answer is 100 percent clear. And that's what the trial court found. And I'm going to sort of push through to some of the other issues, for example, the statute of frauds. The statute of frauds is not applicable. And there's a couple reasons for that. First is if there's full performance, then the statute of frauds doesn't, it doesn't apply. Alma paid all the money she was supposed to pay. They paid for half of the mortgage. They paid when the mortgage, what mortgage was accelerated. They paid for the real estate taxes. They paid for the improvements. They paid for the upgrades. They paid for the renovations to the house. The argument was made that Alma didn't introduce any evidence regarding this. That's not true. Initially, Iller had said, I didn't pay anything to buy the house. Then all of a sudden, Iller was shown a check that he had for $5,000 to buy the house. Then his story changed. Oh, that was a loan. Then all of a sudden, the argument was, we never paid for the real estate taxes. We never paid for any of the renovations. We never paid for these upgrades. Then he was shown the bank records and the council checks for this. And then his story changed. Oh, at that point, we were just paying for the utilities. But all of these payments were, I'm sorry, Judge. Well, let me ask you this, Mr. Hanauer. We have a deed where there are three people who are owners of the house by tenants, tenants in common. How does Iller go from there where it's, you know, third, under any theory that I'm familiar with, to 50% ownership? Well, I don't think tenants and commons necessarily has to say that you're all equal owners or that- Well, I mean, if you're going to argue otherwise, don't you need some document or something to suggest that? Well, I think that's the whole purpose of the promissory estoppel. It's an equitable cause of action to prevent injustice. So when the deed was done, there were two deeds, the initial deed and then the second deed when she was 17 when both were executed. She couldn't have been on the mortgage. In fact, her testimony was she thought that by Iller being on the mortgage, she had an ownership interest in the house as a result. My question about the deed is not the fact that Alma's not on it. It's the percentage ownership that is Iller's. And if you're giving Alma 50% of it, I don't know how we get looking at the deed from 30% to 50% ownership. I understand that. I think the answer to that question is that the promise was that they own 50% and the trial court made a finding that they own 50%. And that promise that they own 50% was notwithstanding whatever the deed had to say. That was the agreement between the parties that Alma and Iller own 50%. Let me do real, real quick then. I see my yellow light is on the 503 contemplation of the marriage. The legislature amended. And let me start by saying, first of all, that if the court finds that the trial court was correct with promissory estoppel, then my argument, the 503 contemplation of the marriage is in essence moot. But if the court overturns the trial court with the 503, excuse me, with the promissory estoppel, then I think the 503 contemplation of marriage is relevant. With the 503 contemplation of the marriage, the legislature changed section 503 of the Dissolution Act. It added a sentence. And that sentence is... Solely? Exactly. And I was trying to look for the exact language. It is that property acquired prior to the marriage that would otherwise be non-marital property shall not be deemed to be marital property solely because the property was acquired in contemplation of the marriage. It added that word... Excuse me, the whole sentence is new, but I see my red light's on. I apologize. You can finish this thought, please. Thank you, Judge. They added that sentence and they have that word in there solely. And something other than contemplation of the marriage. There has to be a purpose. The legislature put that word solely in there. And I cited the Weisman. And in Weisman, there was property acquired before the marriage. And it wasn't just that the intent that it would be marital property. They paid for the mortgage and they paid for other things for the house during the marriage. And then they said, okay, that's marital property when you look at that. And I think that's what the legislature was intending with this sentence. And with solely, is there more than just an attempt? Did they do something else? And in this particular case, the answer is yes. For 26 years, Aaliyah and Alma paid for this house. And it was in contemplation of the marriage. It was said, yeah. All right. We're going to give you an opportunity a little later, Mr. Hanauer. I appreciate it. Justice Petal or Justice Albrecht, any questions? I do, but I think I'm going to wait. But just to finish on that, the 503, you never raised 503C2 during the trial or did you, counsel? Did I miss that? The contribution from the estate? We did. And it was rejected. Rejected is a bad word. The judge looked at it and accepted the reimbursement and the contribution, but the judge said it would be inequitable to apply reimbursement towards the Carroll Stream house because he thought it would end up in Aaliyah and Lefter getting more than the 50% of the ownership interest in the house. So I think that the trial court rejected that because it would have given them more than they were entitled to under my client's position. That's what the court said, but why would the dollar for dollar contribution? I don't know. The short answer is the court were an equitable distribution state, not equal. So the court could have done 75, 25, whatever the court's reasoning as to why it didn't apply that wasn't in the opinion. And I don't want to speculate as to that. Thank you. Mr. Black and you're muted. Thank you very much. First off on that, at that last point, the 503 C2, if the trial court made specific findings under 503 C2 that were in favor of Aaliyah and against Alma, they're not raised on the cross appeal. So those are forfeited. More specifically, the 503 C2 issues were, I'm going to come back a little bit. I have not been able to locate any cases as promissory estoppel was available in a dissolution action. I'm going to point out too that Katrina cannot bind Aaliyah. So whatever Katrina might have said or said, or might've said doesn't count when we're talking about sitting at the kitchen table or anything in Greece, the trial court expressly ruled that that was vague and can't form the basis of anything. And it wasn't going to consider it. In fact, again, on the motion to reconsider, the court clarified that the vagueness comment was about everything that before the marriage. I think your honors are identified. What was the promise here? Keep hearing about, well, she'd come to America and she'd get the education and she owned a house, which was all beforehand. And the trial court rule, that's not part of anything. More than that, what's the reliance element here? And further, what's detriment to her? Trial court made no such finding. The family lived in the house for 26 years. I don't know any detriment has been identified. Also in terms of the 50%, my recollection is that Alma testified it was her understanding that it was 50%. And I have to, I'm going to go back to the record myself to find where it was that the lawyer specifically said, promised her 50% in return for X, Y, and Z. So that might there. In terms of not pleading, the pleading is not going to the issue. If the court was without jurisdiction to begin with, the word itself is void ab initio. It can be erased at any time in any court. Again, going back to reimbursement, their reimbursement was not utilized as an avenue to do anything here. Reimbursement to the marital estate. And in fact, the reimbursement must be traceable by clear and convincing evidence or the contribution, I'm sorry, by clear and convincing evidence. And the court never ruled there was any such clear and convincing evidence. Again, I'm going to go back to that ownership interest, the 50%, who made the promise, who didn't make the promise, how could Petrina bind there to that promise? That's just, even if you get beyond whether or not promissory estoppel can be utilized properly in a dissolution action where the Illinois Supreme Court says it is a statutory creation, then the remedies are all of the statute, which would be section 503. There is no remedy here that was fashioned under and pursuant to 503. To Black, the fact that they were served, in this case, the fact that the complaint was amended, and we have a hybrid cause of action that has a divorce and a property action going on at the same time under an equitable theory, is that possible? I'm sure there's no cases on it, but why would that not be possible? Again, the record is a little spotty. Yes, they did appear, but the supplemental complaint, or I believe that's what it was called, doesn't name them, doesn't name them. And I'm sorry, Ron, if we're forgetting- No, I think you've answered my question. Just because they're served with a complaint, if it doesn't affect them, it doesn't speak to them. I think that's what you're saying. Their interest is being affected, and they're not parties. They're third parties. Any additional questions from Justice Albrecht? No. All right, Mr. Black, does that conclude your presentation? Thank you. Mr. Hanna. Thank you again. In response to the argument that it's not believable, or there was no evidence regarding this ownership interest, in other words, Alma and Allura owned it 50%, and Lefter and Petrina owned 50%. That's not accurate. Alma testified that they owned 50%. And the trial court made a specific finding. Petrina and Lefter, excuse me, Petrina and Allura argued and testified that there was no agreement, nothing. But the trial court makes the very specific finding that the testimony of Petrina and Allura was incredible in some aspects. And so- Qualifying that, some aspects. It's very clear that you found it to be incredible as it related to the $40,000 and the jewelry, and other portions when approached. But you're taking that and extrapolating it to the testimony about the promises made, correct? No, Petrina specifically was about the house and the promises made, specifically. And then the trial court, I don't think, I think his words, the trial court's words with Aaliyah regarding the house is that maybe it would have been unbelievable. I think it was, but I don't know the exact word. But the trial court made some credibility and factual findings. The next argument was what detriment was there for Alma? Alma testified repeatedly. She would have never stayed in this house. She would have bought her own house. So she built up equity. Thank you, counsel. How is she going to do that? She's married. She said her and Allura would have just bought their own house. She's speaking for Allura then. Well, as a married couple, I mean, at that point, it was as a married couple. She said that, yes, they would have not stayed in this house. They would have bought their own house and built up equity in their own house. As a matter of fact, the incident after the hotel, they specifically talked, Alma testified that they specifically talked about that, and they both agreed to go back to the Carroll Stream house. So she would have never, ever stayed in the Carroll Stream house if she wasn't building equity in that house. She would have done all these improvements and repairs and contributions and paid the real estate taxes, but for the ownership interest. But she is a married person. So the marital estate would have not continued to contribute to the Carroll Stream house. That's really the only argument you can make, correct? The answer is yes. I think there's only a marital estate after someone files for divorce, but in theory, it was the marital estate. But the answer is yes. They, as a joint couple, were paying for those expenses for the Carroll Stream residence. Yes, 100%. And then real quick, if I can go back to the 503, this in contemplation of the marriage. The legislature hasn't ruled out property in contemplation of the marriage, but there must be more than something in intent. There has to be something afterwards. And just as in this case, they both continued to pay for this property afterwards. Real quick with the missing property and the $40,000 in the jewelry. Alma testified that she left on March 31st of 2021. She got in a fight. The 40,000, they both admit the 40,000 was in the safe. The 40,000 was there. The jewelry was there. And then she left and she didn't take the jewelry. Her daughter, Mary, testified that she went back into the house on April 17th of 2021. Mary took a picture of the jewelry in the safe. And then after that, Alma went back with the police at the end of April and all of it was missing. Alir said he didn't know what happened with it, but Mary specifically had a picture where Alir was the only one with access to it and the jewelry was in the safe. Then Alir's testimony strangely said he cleaned out the safe on I think March 31st before Mary came through with the police. So he admits that he took it, but he said he didn't have the jewelry, but there's a picture with the jewelry. And the court made a finding, a factual finding that he had taken the property. So I think with that issue, it should be the trial court's decision should be affirmed. In closing, I think the trial court was accurate based upon the evidence for promissory estoppel. If the court disagrees and reverses the trial court, then the court should also reverse the ruling regarding the 503 purchased in contemplation of the marriage and send that back as well. I thank everyone for your time. Thank you. Any questions, Justice Salbert or Justice Heddle? No, nothing further. The court thanks both counsel for a spirited argument. We will take the matter under advisement and render a decision in due course.